# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 02-1425

_____

Wendi Ferguson Sellers,      *
            *
       Appellee,      *
            *     Appeal from the United States
     v.              *     District Court for the
            *     Eastern District of Missouri.
Norman Y. Mineta, Secretary of     *
Transportation,           *
            *
       Appellant.      *

_____

Submitted:   April 14, 2003
Filed:   February 24, 2004

_____

Before LOKEN, Chief Judge, HANSEN and BYE, Circuit Judges.

_____

HANSEN, Circuit Judge.

Wendi Sellers brought an action against the Secretary of Transportation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u> (2000), alleging that she was unlawfully discriminated against in her employment on account of her gender and in retaliation for filing a sexual harassment complaint. Pursuant to 28 U.S.C. § 636(c), with the parties' consent, the claims were tried before a magistrate judge and a jury. After the jury returned a verdict in favor of Sellers, she moved for equitable relief in the form of reinstatement or, in the alternative, front pay.

The district court denied reinstatement but awarded Sellers front pay in the amount of $638,293.99. The government appeals the front pay award. For the reasons stated below, we vacate the award and remand to the district court.

I.

Sellers was employed by the Federal Aviation Administration (FAA) as an Air Traffic Control Specialist at Lambert Airport in St. Louis beginning in 1987. Sellers alleged that she was subjected to a hostile work environment beginning in 1996 and lasting through the time of her termination in 1997. The harassment began when John Joseph, who was also employed at Lambert, made unwanted sexual advances toward Sellers and, on one occasion, sexually assaulted Sellers at her home. Sellers complained of this conduct to her coworkers, supervisors, and union officials. Although Joseph's harassing conduct ceased after Sellers' complaints, the workplace atmosphere at Lambert deteriorated as Sellers was subjected to on-the-job harassment. Because of the deteriorating atmosphere, the FAA decided to terminate Sellers effective September 30, 1997.

From October 1997 through April 2000, Sellers worked at the Bank of America. The bank terminated Sellers on April 14, 2000, after she attempted to process an unauthorized loan application in the name of her spouse's former wife. When bank representatives questioned Sellers about the loan application, she admitted her wrongful conduct, explaining that she had completed the application to obtain her spouse's ex-wife's credit history.

Sellers' case was tried during March 2000, when she was still employed by the bank. The jury awarded Sellers $800,000 in noneconomic compensatory damages and $345,000 in backpay. On April 4, 2000, the district court entered judgment in accord with the jury's verdict and then granted the Secretary's motion for remittitur, reducing Sellers' noneconomic damages award to the statutory maximum of

2

$300,000.  See 42 U.S.C. § 1981a(b)(3)(D) (2000).  The district court also granted Sellers' motion for prejudgment interest in the amount of $27,329.33.  Sellers sought further equitable relief in the form of reinstatement or front pay.  On April 25, 2000, the Secretary moved for a stay of the proceedings with respect to the requested equitable relief, noting that he had recently received information regarding Sellers' discharge from Bank of America that "if proved, would have a direct impact on the plaintiff's motion [for equitable relief], defendant's ability to even consider reinstatement . . . and ultimately, therefore on the issue of front pay."  (Appellee's App. at 24-25.)  On November 19, 2001, the court held a hearing on the reinstatement/front pay motion.  The district court concluded that reinstatement was impractical because of the level of acrimony still present between Sellers and her coworkers, supervisors, and the FAA.  In lieu of reinstatement, the district court awarded Sellers front pay.  On appeal, the Secretary argues that the district court abused its discretion in awarding Sellers front pay because her post-termination conduct–that is, her termination from the Bank of America for processing a false loan application–made her unsuitable for reinstatement as an air traffic controller.  The Secretary argues in the alternative that the front pay award was excessive under the circumstances.

II.

The primary issue presented is whether the post-termination misconduct of a discharged employee that would prevent reinstatement with the defendant/prior employer limits the equitable remedy of front pay.  It is a question of first impression in this circuit.

A.    Waiver of After-Acquired Evidence Theory

Initially, we reject Sellers' argument that the Secretary waived this issue by failing to raise it before the district court.  Even if the after-acquired evidence theory

3

advanced by the Secretary is an affirmative defense that must be pleaded, as claimed by Sellers, clearly the Secretary cannot be expected to raise the defense in an answer filed over two years prior to the events giving rise to the defense. Further, the Secretary filed a Motion For a Stay of Proceedings within days of learning of the events, alerting the court that it was investigating alleged wrongdoing as the basis for Sellers' termination from Bank of America and noting that the events would have a direct impact on the issues of reinstatement and front pay. A significant portion of the November 1991 hearing was devoted to testimony about the events surrounding Sellers' termination from the bank and how those events affected the FAA's consideration of reinstating Sellers. (See Appellant's App. at 46-47, 189-93, 211-14, 225-26.) The district court specifically found that Sellers was terminated from the bank for the misconduct. That misconduct formed the basis for the FAA's decision not to offer reinstatement to Sellers in April 2001. (D. Ct. Order at 6.) In these circumstances, although the Secretary did not cite the specific legal theory to the district court, we conclude that he sufficiently raised the issue before the district court to allow us to consider it on appeal. See Sexton v. Martin, 210 F.3d 905, 914 n.8 (8th Cir. 2000) (reaching issue where facts were alleged in district court brief though controlling authority was not); Stockmen's Livestock Market, Inc. v. Norwest Bank of Sioux City, N.A., 135 F.3d 1236, 1243 n.4 (8th Cir. 1998) (reaching issue encompassed in general argument made before district court where party advancing argument did not present new evidence on appeal and both parties briefed the issue on appeal).

B.    Merits of After-Acquired Evidence Theory

The most relevant Supreme Court case is McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352 (1995). There, the plaintiff alleged that her employer terminated her in violation of the Age Discrimination in Employment Act (ADEA). The employer learned during the plaintiff's deposition that while the plaintiff was still employed with the firm, she had copied and taken home certain confidential

4

documents in violation of her job responsibilities. See id. at 355. The McKennon Court held that after-acquired evidence of employee on-the-job misconduct, which would have resulted in that employee's discharge had the employer known of it, did not preclude recovery under the ADEA. See id. at 356. The Court rejected the proposition, however, that "the employee's own misconduct is irrelevant to all the remedies otherwise available under the statute." Id. at 360-61. The Court explained that "the employee's wrongdoing becomes relevant . . . to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." Id. at 361. Most relevant to our discussion, the Court concluded that:

> The proper boundaries of remedial relief in the general class of cases where, after termination, it is discovered that the employee has engaged in wrongdoing must be addressed by the judicial system in the ordinary course of further decisions, for the factual permutations and the equitable considerations they raise will vary from case to case. We do conclude that here, and as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy. It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds.

Id. at 361-62.

Although McKennon involved the ADEA, its reasoning also applies in the Title VII context. See id. at 357 ("The substantive, antidiscrimination provisions of the ADEA are modeled upon the prohibitions of Title VII."); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) (recognizing the similarity between Title VII and the ADEA because "the substantive provisions of the ADEA were derived in haec verba from Title VII" (internal marks omitted)). Only a few courts have addressed the question of whether the McKennon rationale should be extended to answer the question of whether evidence of misconduct that occurred after the

employee has been terminated, but before the front pay decision is made, is relevant in fashioning equitable relief.

In Ryder v. Westinghouse Elec. Corp., 879 F. Supp. 534 (W.D. Penn. 1995), the district court answered this question in the negative. It reasoned that the after-acquired evidence doctrine "presupposes that there was an employer-employee relationship at the time the misconduct occurred" and that "there cannot be misconduct that the employer did not know about prior to making its adverse decision if the misconduct did not even occur until after the adverse decision was made." Id. at 537. In Sigmon v. Parker Chapin Flattau & Klimpl, 901 F. Supp. 667 (S.D.N.Y. 1995), the plaintiff was terminated from her position as an associate at a law firm for allegedly discriminatory reasons after she returned from maternity leave. After her termination, the firm provided her with an office and telephone to conduct a job search. During this time, the plaintiff copied her personnel file as well as the personnel files of twenty other associates. The defendant argued that even if the plaintiff could prove discrimination, her damages should be limited due to her misappropriation, copying, and retention of the defendant's documents. The district court rejected the argument. Like the Ryder court, it concluded that McKennon was "premised on the employee's misconduct occurring during her employment." Id. at 682-83. The Sigmon court then applied a bright-line rule, concluding that because the misconduct occurred outside the employment relationship, any complaint that the defendant may have had fell outside the McKennon rule. See id. ("Because in this case, plaintiff's alleged misconduct occurred after her termination, McKennon does not govern. . . . In the instant situation, defendant and plaintiff were not in an employer-employee relationship at the time of the alleged incident. Therefore any complaint defendant has against plaintiff for her post-employment conduct falls outside of the McKennon rule. . . .").

In Carr v. Woodbury County Juv. Det. Ctr., 905 F. Supp. 619 (N.D. Iowa 1995), the plaintiff was constructively discharged from her employment as a youth

6

worker as a result of a racially and sexually hostile work environment. The plaintiff filed a motion in limine to exclude evidence of her post-employment marijuana use that the employer discovered during trial preparation. The defendant argued that Carr's post-termination marijuana use was probative of damages because (1) it showed that the County would have fired Carr because marijuana use violated County employment policies and (2) because it showed that Carr was unlikely to have remained at her position for any length of time as it was unlikely that a person with a marijuana habit could have maintained long term employment. The district court granted the motion, excluded the evidence, and declined to extend McKennon. Like the aforementioned cases, the Carr court reasoned that McKennon presupposes that the wrongdoing occurred during the existence of the employment relationship. See id. at 627-28. The court also reasoned that McKennon should not apply because the "marijuana use simply had nothing to do with and did not occur during her employment and caused her former employer absolutely no detriment." Id. at 628-29. Third, the district court reasoned that the County's employment policies could not "properly . . . be imposed upon a person after his or her employment has terminated" because "[i]t would be grossly inequitable to hold [a plaintiff] to all of the burdens of County policies at a time when she is not receiving any of the benefits of County employment." Id. at 629. Finally, the district court concluded that even if McKennon applied, the County had not established that the plaintiff's post-termination conduct was so severe that it would have terminated her for it. See id.

The Tenth Circuit has also confronted this issue. In Medlock v. Ortho Biotech, Inc., 164 F.3d 545 (10th Cir.), cert. denied, 528 U.S. 813 (1999), Medlock was allegedly terminated in retaliation for his filing and pursuing a claim of race-based discrimination. At his unemployment benefits compensation hearing, Medlock verbally abused defendant's counsel. The defendant argued that the district court erred in refusing to instruct the jury that Medlock's post-termination conduct could serve to limit damages. The Tenth Circuit recognized that post-termination conduct could, in an appropriate case, limit a plaintiff's remedies. See id. at 555 (stating that

7

it could "not foreclose the possibility that in appropriate circumstances the logic of McKennon may permit certain limitations on relief based on post-termination conduct"). But it concluded that Medlock was not such a case. See id. (stating that in "cases in which the alleged misconduct arises as a direct result of retaliatory termination, the necessary balancing of the equities hardly mandates a McKennon-type instruction on after-occurring evidence").

We are of the view that the aforementioned district court cases gave too crabbed a reading to McKennon. The McKennon Court used sweeping language, instructing lower courts to treat each case on a case by case basis considering all the "factual permutations and the equitable considerations they raise." McKennon, 513 U.S. at 361; see also Mardell v. Harleysville Life Ins. Co., 65 F.3d 1072, 1074 n.4 (3d Cir. 1995) (stating that the "Supreme Court did not limit the general principles articulated in McKennon to cases involving on-the-job misconduct, instead using the broader term 'wrongdoing'"). Thus, like the Tenth Circuit, we cannot establish a bright-line rule and foreclose the possibility that a Title VII plaintiff's post-termination conduct may, under certain circumstances, limit the remedial relief available to the plaintiff. A simple illustration will demonstrate why and how post-termination conduct may be relevant, in some circumstances, in limiting relief. Let us suppose that after the FAA had terminated her, and before the district court granted her equitable relief, Sellers had been convicted of some crime wholly unrelated to her former position with the FAA and was incarcerated such that reinstatement was now an impossibility. Simple common sense tells us that it would be inequitable to award her front pay in lieu of reinstatement where she had rendered herself actually unable to be reinstated.

The nature of the front pay remedy itself is what makes the answer to the above illustration so intuitive. Front pay is a disfavored remedy that may be awarded in lieu of reinstatement, but not in addition to it, where the circumstances make reinstatement impractical. See Salitros v. Chrysler Corp., 306 F.3d 562, 572 (8th Cir.

2002) (stating that front pay is a disfavored remedy); <u>Kucia v. S.E. Ark. Cmty. Action Corp.</u>, 284 F.3d 944, 949 (8th Cir. 2002) (stating that reinstatement should be the norm and that front pay is an exceptional remedy); <u>Smith v. World Ins. Co.</u>, 38 F.3d 1456, 1466 (8th Cir. 1994) ("Front pay is an equitable remedy, which . . . may be awarded in lieu of, but not in addition[ ] to reinstatement."). The availability of front pay as a remedy thus presupposes that reinstatement is impractical or impossible due to circumstances not attributable to the plaintiff. It would be inequitable for a plaintiff to avail herself of the disfavored and exceptional remedy of front pay where her own misconduct precludes her from availing herself of the favored and more traditional remedy of reinstatement. As such, we hold that a plaintiff's post-termination conduct is relevant in determining whether a front pay award is available, and if so, in determining the extent of the award.

Our conclusion that an employee's post-termination conduct can, in some circumstances, limit an employee's remedies for a wrongful discharge is not a new one. For example, we have previously concluded that a terminated employee could forfeit the remedy of reinstatement under the National Labor Relations Act where he threatened his supervisors post-discharge. <u>See</u> <u>Precision Window Mfg., Inc. v. N.L.R.B.</u>, 963 F.2d 1105, 1108 (8th Cir. 1992) (stating that "a fired employee 'does not have an unlimited right to engage in misconduct without losing his remedial rights'" (quoting <u>Precision Window Mfg., Inc.</u>, 303 N.L.R.B. No. 141 (Raudabaugh, dissenting))). We have also concluded that front pay would be unavailable where the plaintiff's own post-termination conduct prevented reinstatement. <u>See</u> <u>Smith</u>, 38 F.3d at 1466 (stating that an unreasonably rejected offer of reinstatement will bar entitlement to front pay). It requires no leap in logic to conclude that if an unreasonable rejection of an offer of reinstatement precludes a front pay award, then post-termination misconduct of a type that renders an employee actually unable to be reinstated or ineligible for reinstatement should also be one of the "factual permutations" which is relevant in determining whether a front pay award is appropriate. <u>See</u> Christine Neylon O'Brien, <u>The Law of After Acquired Evidence in</u>

9

Employment Discrimination Cases: Clarification of the Employer's Burden, Remedial Guidance, and the Enigma of Post-Termination Misconduct, 65 U.M.K.C. L. Rev. 159, 174 (1996) (concluding that where post-termination misconduct is egregious, such conduct should bar reinstatement).

McKennon makes clear that the burden of establishing these facts rests on the employer. See McKennon, 513 U.S. at 362-63 (stating that employer must establish that "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone"). The court must look to the employer's actual employment practices and not merely the standards articulated in its employment manuals, for things are often observed in the breach but not in the keeping. See O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756, 759 (9th Cir. 1996) (stating that inquiry must focus on actual employment practices). The government argues that it has established the relevant facts showing that Sellers is no longer eligible for reinstatement because FAA hiring practices provide that a person who has been terminated from, or forced to resign, a position is unsuitable for employment as an Air Traffic Control Specialist. The district court concluded that the FAA's assertion that Sellers was unsuitable for reinstatement because of her post-termination conduct was evidence of the acrimonious relationship between them, but there is no specific finding by the court that FAA employment regulations and policies as applied to Mrs. Sellers do in fact bar her reinstatement or employment as an Air Traffic Control Specialist. There is no finding that the FAA regularly adheres to this alleged policy or that the FAA has made an official determination that Sellers is, in fact, unsuitable for reinstatement solely because of her post-termination conduct. That the FAA chose not to offer Sellers reinstatement does not equate with finding that Sellers' conduct alone made her ineligible for reinstatement.

Accordingly, we vacate the district court's award of front pay and remand for further findings of fact and conclusions of law to be made on the existing record. No reopening of the evidentiary record shall occur, but the court may, of course, in its

discretion call for additional briefing and argument. On remand, in order to establish that Sellers' front pay remedy should be limited by her post-termination conduct, the defendant must convince the court by a preponderance of the evidence that Sellers' post-termination conduct renders her ineligible for reinstatement under the FAA's employment regulations, policies, and actual employment practices.[1]

## III.

A.　Length of Front Pay Period

The Secretary also argues that even if Sellers was entitled to a front pay award, the award as made was excessive because Sellers failed to mitigate her damages by seeking a comparable job following her termination. If the district court determines on remand that Sellers' conduct did in fact render her ineligible for reinstatement, this issue need not be addressed. Front pay is an alternative remedy to reinstatement and should be unavailable where the plaintiff's own conduct prevented reinstatement. See Smith, 38 F.3d at 1466; see also McKennon, 513 U.S. 361-62 ("[A]s a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy."). We address this issue, however, in the event that the district court determines on remand that Sellers' post-termination conduct did not in itself bar her reinstatement.

---

[1]The proper query is whether the FAA would have reinstated Sellers, not whether it would have terminated her. Although McKennon required the employer to prove that "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge," 513 U.S. at 362-63, that case involved pre-termination on-the-job misconduct that the employer advanced as a legitimate justification for termination. The FAA does not rely on Sellers' post-termination conduct as justification for her termination, nor could it as the conduct occurred two years after the termination. Rather, the FAA relies on it solely to avoid the equitable remedies of reinstatement or front pay, thereby shifting the inquiry to whether Sellers would have been reinstated.

Sellers asked for front pay in an amount sufficient to compensate her for the difference between her then-current salary of $24,889 and her FAA salary of $106,285 at least until her mandatory retirement age of 56, a period of 19 years. The district court awarded Sellers front pay for the 20-month period between the time of the verdict and the time of the ruling on the front pay motion based on the difference between what she actually earned and what she would have earned had she remained employed by the FAA. It found Sellers' request for front pay until retirement "too uncertain" and awarded her an additional seven years of front pay based on the difference between her current salary as an office manager and the FAA salary "to afford [Sellers] the opportunity to obtain employment with comparable compensation and responsibilities." (D. Ct. Order at 14.)

In declining to award Sellers front pay until she reached retirement age, the district court considered a number of factors, including her relatively young age (37), her education and extensive experience in the aeronautical field, her minimal efforts at mitigation, and the status of the aeronautical industry. Because we believe that eight years and eight months[2] is the outside limit of an appropriate front pay award given Sellers' age, education, and extensive experience (without considering any minimal mitigation attempts), we cannot say that the length of the district court's ultimate award was an abuse of discretion, especially when it considered the relevant factors. See Salitros, 306 F.3d at 570 (affirming seven-year front pay award until plaintiff's normal retirement age); United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp., 81 F.3d 798, 805 (8th Cir. 1996) (expressing "grave doubt" that a 24-year front pay award could be upheld and stating that "[i]nstead of

_____

[2]The Secretary refers to the front pay award as a seven-year award. Sellers actually received an eight-year and eight-month front pay award: the 20-month period between verdict and judgment, and the additional seven years beyond the judgment. The factors used by the district court in fashioning the seven-year award apply equally to both periods, and our references to the front pay award refer to both periods.

12

warranting a lifetime of front pay, Fiedler's relatively young age should improve his future opportunities to mitigate through other employment"); Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101, 3 F.3d 281, 286 (8th Cir. 1993) (affirming front pay award of ten years).

B.     Dollar Amount of Front Pay Award

We believe, however, that the district court did abuse its discretion by not reducing the annual amount it used to calculate Sellers' award to reflect Sellers' failure to mitigate. Following Sellers' termination, she worked as a loan officer and an office manager, both of which paid an annual salary of approximately $25,000. The district court specifically found:

> Although [Sellers'] air traffic experience would qualify her for employment with private aviation contractors, including jobs such as airline and/or law enforcement dispatcher, consultant, or with private air traffic control towers, [Sellers] sought no such employment. Instead, [Sellers] sought relatively low paying jobs, and the nature of the great majority of jobs for which [Sellers] applied was in no way related to the field of aviation.

(D. Ct. Order at 5.) To avoid a reduction in her front pay award, Sellers had a duty to mitigate her damages by seeking comparable employment. See Denesha v. Farmers Ins. Exch., 161 F.3d 491, 502 (8th Cir. 1998). While the district court found that she did not adequately attempt to mitigate her damages, it failed to sufficiently reflect her failure in its award. See id. (affirming reduction in front pay award where plaintiff failed to "make some sustained minimal attempt to obtain comparable employment"). The district court's award at a differential between the actual and FAA salaries does not adequately account for her failure to mitigate. As relevant on remand, the district court should determine an amount that Sellers could have earned if she had attempted to find comparable work, and reduce any award accordingly.

See id. ("[A]n amount equal to what Denesha would have earned if he had made reasonable mitigation efforts was properly subtracted from his award.").

IV.

The district court's award of front pay is vacated, and the case is remanded to the district court for further proceedings not inconsistent with this opinion.

LOKEN, Circuit Judge, concurring.

I join the opinion of the court. I write separately to address an additional issue relevant to the proceedings on remand. Judge Bye in dissent observes, "the record shows Sellers's reinstatement was impractical due to other circumstances (i.e., the hostile environment she would have faced working for an employer who still employed the man who sexually harassed her)." Ante at 23. If Judge Bye means to suggest that reinstatement is not potentially an issue on remand, I disagree. In my view, the issue of reinstatement will be very much alive *if* the FAA fails to establish that Sellers's post-termination misconduct made her ineligible for reinstatement.

Sellers's post-verdict motion for equitable relief properly sought the preferred remedy of reinstatement and included an alternative request for front pay if reinstatement was impractical. Because Joseph continued to be employed at Lambert Airport, Sellers requested reinstatement at another FAA facility, specifying three that would be convenient or suitable for her. Thus, while Judge Bye is correct that Joseph continued to be an FAA employee, the reinstatement Sellers requested would not have required her to work at the facility where Joseph was employed, and where her relations with other staff had significantly deteriorated prior to her termination. The FAA's response opposed front pay relief and advised that the agency was considering the feasibility of reinstatement. After learning of Sellers's termination by Bank of America, the FAA decided in April 2001 not to reinstate her and argued to the district

14

court that she was ineligible for reinstatement as an air traffic controller because of "misconduct which resulted in her termination from [Bank of America]." Mem. & Order of Dec. 13, 2001, at p.6.

The district court denied reinstatement, but not because of Sellers's Bank of America misconduct. Rather, the court concluded that reinstatement "is impracticable in the circumstances" because the FAA expressed a continuing "unfavorable disposition" and "hostility" toward Sellers's re-employment. Mem. & Order of Dec. 13, 2001, at p.9. For this conclusion, the court cited our decision in Cowan v. Strafford R-VI School Dist., 140 F.3d 1153, 1160 (8ᵗʰ Cir. 1998). But in Cowan, reinstatement would have reunited a terminated teacher with her antagonist, the school principal, at the same facility. Thus, the "hostility" issue in Cowan was comparable to the question whether Sellers should be reinstated at Lambert Airport with Joseph and other antagonistic co-workers, equitable relief Sellers did not seek. In Cowan, as in our earlier decision in Standley v. Chilhowee R-IV Sch. Dist., 5 F.3d 319, 322 (8ᵗʰ Cir. 1993), we were unwilling to order a reinstatement that would threaten the proper functioning of a school by re-establishing admittedly hostile day-to-day working relationships between a teacher and her principal (Cowan), or between a number of teachers (Standley).

As the district court acknowledged earlier in its memorandum and order, Cowan and Standley "presented extraordinary circumstances which warrant denial of reinstatement." 140 F.3d at 1160. On the other hand, "hostility engendered from litigation" is not extraordinary and does not bar this preferred remedy. Taylor v. Teletype Corp., 648 F.2d 1129, 1139 (8ᵗʰ Cir.), cert. denied, 454 U.S. 969 (1981); accord Dickerson v. Deluxe Check Printers, Inc., 703 F.2d 276, 281 (8ᵗʰ Cir. 1983). Therefore, only "[s]ubstantial hostility, above that normally incident to litigation, is a sound basis for denying reinstatement." United Paperworkers Int'l Union v. Champion Int'l Corp., 81 F.3d 798, 805 (8ᵗʰ Cir. 1996), quoted in Hammond v. Northland Counseling Ctr., Inc. 218 F.3d 886, 892 (8ᵗʰ Cir. 2000). Yet the district

15

court never analyzed whether, assuming Sellers was eligible for reinstatement despite her termination by Bank of America, the FAA demonstrated that its opposition to reinstatement was anything more than the lingering ill-will or hostility normally incident to this type of Title VII litigation.

In these circumstances, the district court on remand must first explore, in accordance with this court's opinion, whether Sellers's post-termination conduct renders her ineligible for reinstatement. If the FAA meets its burden of proof on that issue, presumably neither reinstatement nor front pay will be appropriate equitable relief. On the other hand, if Sellers prevails on this issue, then I think the district court should next revisit the issue of reinstatement, bearing in mind that "the passage of time may soften the most acrimonious of relationships," United Paperworkers, 81 F.3d at 805, and determining whether there are terms of reinstatement reasonably comparable to those proposed by Sellers that are not impractical because of either hostility above that normally incident to litigation or other sufficient reasons. In this regard, the parties must remember that reinstatement is the preferred equitable remedy. Therefore, the FAA, having violated Title VII, must have strong reasons to avoid reinstatement, and Sellers may not abandon her former willingness to accept reinstatement because she might now prefer a substantial front pay award. If the district court determines that equitable relief is appropriate despite the Bank of America termination, *and* that reinstatement is impractical under these rigorous standards, the court should then return to the question of front pay, including the issues of the length and dollar amount of front pay discussed in the court's opinion.

BYE, Circuit Judge, dissenting.

I disagree with the majority opinion in two respects. First, the Secretary failed to argue in the district court that post-termination misconduct precludes an award of front pay, and therefore waived the claim now raised on appeal. Second, if we were to reach the issue, I do not believe the record developed by the Secretary establishes

16

Sellers's reinstatement was impractical or impossible due to her misconduct. Because the record establishes only that reinstatement was impractical due to circumstances not attributable to Sellers, I believe she is still entitled to front pay, and I see no reason to remand this case. For both reasons, I respectfully dissent.

I

The Secretary's arguments in the district court regarding Sellers's post-termination misconduct, as well as his factual development of the record, all related to whether it was practical or possible to reinstate Sellers as an air traffic controller. Absent from the record is any argument Sellers's post-termination misconduct should preclude front pay as well. The record shows the following with respect to the misconduct issue.

First, the initial motion informing the district court about Sellers's post-termination misconduct focused on reinstatement rather than front pay. See ante at 3 (quoting Appellee's App. at 24-25). As the proceedings involving Sellers's misconduct unfolded, the Secretary remained focused on reinstatement, not front pay. For example, on May 1, 2000, in response to Sellers's motion for equitable relief and prejudgment interest, the Secretary stated "defendant is still exploring the possibility or even feasibility of reinstating plaintiff. With respect to front pay, it is defendant's position plaintiff is not entitled to front pay under the facts in this case." Appellant's App. at 24-25. The response did not, however, explain why front pay would not be warranted if Sellers was not reinstated.

On March 12, 2001, the district entered an order for a hearing on Sellers's motion for equitable relief "at which time [the parties] shall prepare to present evidence *and argument* in support of their respective positions." Id. at 18 (District Court Docket Entry #144) (emphasis added). The hearing was not held until

17

November 19, 2001.  In the interim, the Secretary never filed a brief arguing misconduct should preclude an award of front pay.

> At the hearing on November 19, 2001, Sellers's counsel represented it was his
>
> understanding that Defendant opposes the reinstatement request in part, or perhaps in whole, as a result of an incident that occurred which resulted in the cessation of Ms. Sellers' employment with Bank of America.  That employment ceased about two weeks after the jury verdict in this case.  Apparently, the Defendant alleges some kind of ethical or moral transgression on the part of the Plaintiff.

Id. at 46.  The Secretary's response to that statement was limited to the issue of reinstatement and never suggested the Bank of America incident precluded front pay as well.  Id. at 47.  Indeed, when the Secretary presented evidence at the hearing, his focus was still on the issue of reinstatement, not front pay.

Finally, at the end of the hearing, the district court specifically asked both counsel whether there was "anything else" the court needed to address – clearly an opening for the Secretary to make a legal or factual argument regarding front pay – and the Secretary's counsel replied, "No, your honor."  Not once did the Secretary cite McKennon or any other cases discussing whether post-termination misconduct should preclude an award of front pay.

Nevertheless, the Secretary argues he preserved the issue by presenting factual evidence on Sellers's misconduct and by generally opposing front pay.  I respectfully disagree.  The Secretary never gave the district court reason to suspect a legal connection between those facts and the issue of front pay.  The after-acquired evidence doctrine "requires factual as well as legal development[]." EEOC v. Farmer Bros. Co., 31 F.3d 891, 901 (9th Cir. 1994).  That observation is particularly true here because the state of the law at the time was decidedly against the Secretary on

18

whether the after-acquired evidence doctrine applied to conduct occurring after an employee's termination. See Carr v. Woodbury County Juvenile Det. Ctr., 905 F.Supp. 619, 629 (N.D. Iowa 1995) (declining to extend McKennon to misconduct that occurred after the employment relationship had ended); Sigmon v. Parker Chapin Flattau & Klimpl, 901 F.Supp. 667, 682 (S.D. N.Y. 1995) (same); Ryder v. Westinghouse Elec. Corp., 879 F.Supp. 534, 537 (W.D. Pa. 1995) (same); but see Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 555 (10th Cir. 1999) (stating that "McKennon may permit certain limitations on relief based on post-termination conduct.").

While the Secretary developed a factual record that may have *arguably* been broad enough to encompass an after-acquired evidence defense as it related to the impracticability or impossibility of reinstatement, he certainly never developed a legal or factual argument that the doctrine should preclude an award of front pay. Thus, the district court had no opportunity to decide the issue now before this court, that is, whether the after-acquired evidence doctrine should affect a plaintiff's right to front pay when reinstatement is impracticable. The Secretary's waiver of this issue is apparent when examining the district court's memorandum and order. The district court discussed the misconduct extensively in the section of the memorandum addressing reinstatement, but never mentioned the misconduct in the section addressing front pay. Because the Secretary never argued the misconduct should preclude front pay, the district court never considered the issue.

This case is analogous to Farmer Bros. There, the defendant attempted to impeach the plaintiff by introducing facts about her misconduct without making any legal argument the misconduct should preclude an award of front pay under the after-acquired evidence doctrine. 31 F.3d at 901. The Ninth Circuit concluded the defendant "failed to raise properly the after-acquired evidence defense." Id. Similarly, here the Secretary introduced facts about Sellers's misconduct, but did so

only to show the impracticability of reinstatement. The Secretary never argued the misconduct should preclude an award of front pay.

The factual record developed by the Secretary at the hearing further indicates he waived the front pay issue. In McKennon, the Supreme Court held "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." 513 U.S. at 362-63. While the majority now states the test somewhat differently (see ante at 11 & n.1), McKennon would have required the Secretary to show he would have terminated Sellers for her misconduct in order to make an award of front pay inappropriate.

Here, the Secretary did not present any evidence showing he would have terminated Sellers for her misconduct. Instead, the Secretary only presented evidence showing he would not reinstate Sellers. In a Title VII case, the relevant consideration for whether a successful plaintiff should be reinstated is whether reinstatement is practicable or possible. E.g., Salitros v. Chrysler Corp., 306 F.3d 562, 572 (8th Cir. 2002). This consideration differs from the considerations for terminating an employee who already holds a position. Misconduct that might make it impractical to reinstate may not suffice to show an employer would have terminated.

Thus, the Secretary would have had to present markedly different evidence to satisfy the McKennon standard. The employment of air traffic controllers is governed by 5 U.S.C. § 7513(a), which provides "an agency may take an action covered by the subchapter [which includes removal] against an employee only for such cause as will promote the efficiency of the service." Furthermore, an "employee against whom an action is taken under this section is entitled to appeal to the Merit System Protection Board [MSPB]." Id. at § 7513(d).

To assess the reasonableness of a federal agency's termination of an employee governed by § 7513, the MSPB considers the Douglas factors, so called pursuant to the MSPB's decision in Douglas v. Veterans Admin., 5 M.S.P.R. 280, 305-06 (1981). See, e.g., Grimes v. United States Postal Serv., 872 F.Supp. 668, 677-78 (W.D. Mo. 1994).

The twelve Douglas factors are:

(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

(2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

(3) the employee's past disciplinary record;

(4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

(6) consistency of the penalty with those imposed upon other employees for the same or similar offenses;

(7) consistency of the penalty with any applicable agency table of penalties;

(8) the notoriety of the offense or its impact upon the reputation of the agency;

(9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

(10) potential for the employee's rehabilitation;

(11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice, or provocation on the part of others involved in the matter; and

(12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employees or others.

Id. at 678 n.7.

Significantly, the Secretary did not ask any witness to discuss the Douglas factors, which the FAA would have had to take into account in terminating Sellers if the termination was to survive MSPB review. Nor did the Secretary ask any witness to explain how Sellers's misconduct would establish cause for termination as would "promote the efficiency of the service" under 5 U.S.C. § 7513, the relevant standard if the issue was Sellers's termination rather than her reinstatement. Finally, the Secretary did not ask any witness whether the FAA would have terminated Sellers for the type of misconduct she committed at Bank of America, had she still been working for the FAA at the time of the misconduct. In sum, not only did the Secretary fail to make a legal argument regarding front pay, he also failed to develop the type of factual record necessary to satisfy McKennon's standard.

We consider legal arguments raised for the first time on appeal only when they require no additional factual development, or manifest injustice would result. Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 725 (8th Cir. 2002). The Secretary would have had to develop the factual record much more extensively to assert, and preserve, the

22

after-acquired evidence defense in the district court. Given the uncertain state of the law on the issue whether the doctrine extended to post-termination misconduct, had the Secretary made the legal argument he waived, I cannot conclude the district court's decision to award front pay resulted in manifest injustice. Therefore, I do not believe we should address the Secretary's belated argument about front pay.

II

Second, while I may agree with the majority's decision to extend McKennon to post-termination misconduct if I thought we should reach the issue, see Kucia v. Southeast Ark. Cmty. Action Corp., 284 F.3d 944, 949 (8th Cir. 2002) ("Equitable remedies [of reinstatement and front pay] are forward-looking. They should depend on the state of facts existing at the time the remedy is either granted or denied."), I do not believe the Secretary presented sufficient evidence to prove his failure to reinstate Sellers was attributable to her misconduct. Instead, I believe the record shows Sellers's reinstatement was impractical due to other circumstances (i.e., the hostile environment she would have faced working for an employer who still employed the man who sexually harassed her). As a result, I believe post-termination misconduct should not preclude an award of front pay in this case.

At the hearing, Sellers introduced the testimony of James Poole, a former vice president of the FAA's Great Lakes Region. Poole testified regarding eighteen cases in which he represented air traffic controllers who had been terminated by the FAA and who sought reinstatement through the grievance and arbitration procedure. Each of the eighteen cases involved misconduct equally as serious or more serious than the misconduct Sellers committed at Bank of America (e.g., criminal sexual misconduct with a child, embezzlement, fraud, alcohol problems, insubordination, battery, use of illegal substances, child pornography, bribery, harassment of jurors). Poole explained that many of the cases were resolved by a settlement agreement, with the FAA reinstating the controllers involved.

23

The Secretary called Maureen Woods, an Airway Facility Division Manager in the FAA's Great Lakes Region. At a meeting held in April 2001, Woods decided the FAA would not voluntarily reinstate Sellers to her position as an air traffic controller. Woods explained her decision was made solely because of the Bank of America incident. Woods described the issue as one of trustworthiness. On cross-examination, however, Woods acknowledged she had not reviewed any documents regarding the Bank of America incident, and instead based the decision on oral information the FAA attorneys provided her at the April 2001 meeting. She acknowledged she did not give Sellers an opportunity to explain her version of the incident, and she was "a little rushed for time, in terms of we needed to get back to the court to make a decision on reinstatement, and I accepted what the attorneys presented at the meeting." App. at 236.[3]

The Secretary also called Patricia Healey, a Personnel Services Branch Manager in the Human Resources Management Division. Healey testified about the procedures the FAA uses to make hiring decisions, which involve the use of "suitability grids" that grade various types of misconduct into four categories – A, B, C, and D. Healey testified the Bank of America incident would be considered a D violation, which is defined as "[m]ajor: conduct or issue which, standing alone, would be disqualifying, under suitability, for any position." App. at 300. Healey explained the Bank of America incident would fall under table 5, issues related to dishonesty. App. at 250-51. The D category of table 5 provides:

Pattern of dishonesty as reflected in
! disregard for truth
! convictions records

---

[3]The hearing on the reinstatement/front pay issues was originally scheduled for June 18, 2001, and this may be the reason Woods testified she was "rushed" in April 2001 to make a decision on reinstatement.

!       abuse of trust

!       employment records

blackmail; counterfeiting; extortion; robbery, armed; intentional false statement or deception or fraud in examination or appointment.

App. at 304.

Healey explained her belief that a single incident could satisfy the criteria of a category D violation, even though a D violation required a "pattern" of misconduct:

Q.      Does a pattern indicate to you that there are multiple instances of the conduct?

A.      No, not necessarily.

Q.      Do you believe that one incident could result in a finding that there was a pattern?

A.      Because of the forgery, it was an act of forgery, if that is indeed what happened, but it's also an abuse of trust for the position. So, there is a pattern of dishonesty in the individual based on those facts.

App. at 257.

Ultimately, Healey testified only that it was "not likely" a person who committed the type of act Sellers committed at Bank of America would be accepted as suitable for employment as an air traffic controller. App. at 250. On cross-examination, Healey acknowledged the FAA never performed a suitability determination on Sellers. Healey admitted she could not make an official determination without seeing the relevant documents. She reiterated her opinion, however, that it "seems that [Sellers's conduct] fits the category D in the instances

25

that I described earlier, and I don't think I could find this person suitable for employment."  App. at 256-57.

Based on this record, the district court found:

On account of plaintiff's misconduct which resulted in her termination from [Bank of America], the FAA decided not to reinstate plaintiff to FAA employment.  In addition, persons who have been terminated or forced to resign from previous employment on account of employment misconduct are determined by the FAA to be "unsuitable" for employment as a[n] Air Traffic Control Specialist.

Add. at 6.

In my view, the district court clearly erred in finding "persons who have been terminated or forced to resign from previous employment on account of employment misconduct are determined by the FAA to be 'unsuitable' for employment as a[n] Air Traffic Control Specialist."  The record developed by the Secretary clearly does not prove that.  Rather, the record only shows *certain* types of misconduct, those classified as D violations, render a candidate unsuitable for employment.

Furthermore, the record clearly shows Sellers did not commit a D violation. Sellers committed a single act of misconduct at Bank of America.  A single incident cannot logically constitute a "pattern" of dishonesty.  The evidence presented by the Secretary to prove a single incident constitutes a "pattern" was simply incredible, and no other evidence in the record supports the district court's general statement that the FAA considers all persons who commit misconduct of any kind on another job "unsuitable" for employment.  Thus, to the extent the district court credited the Secretary's evidence regarding the suitability grids, it clearly erred in finding Sellers's misconduct met the requirements for a category D violation and rendered her unsuitable as an air traffic controller.

26

In my view, the district court's findings regarding the impracticability or impossibility of Ms. Sellers's reinstatement turned primarily upon the hostility of the environment she would be exposed to if reinstated. The coworker who had sexually harassed Sellers was still employed by the FAA. In addition to that primary fact, I believe the district court merely added the secondary fact the Secretary had decided not to reinstate Sellers, without giving much thought to whether the reinstatement decision was actually justified for the reasons given by the Secretary.

### III

In sum, the Secretary failed to argue post-termination misconduct should preclude an award of front pay before the district court, failed to develop a factual record to prove Sellers's misconduct would have resulted in her termination under the McKennon standard, and further failed to prove the misconduct, standing alone, precluded reinstatement or front pay. Sellers's reinstatement was impractical due to circumstances not attributable to her, and therefore she was still entitled to an award of front pay. Under these circumstances, I see no need for a remand and I respectfully dissent.

_____